UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**UNITED STATES OF AMERICA**,

        Plaintiff,

                                        No. 05-CR-81165
vs.                                     Hon. Gerald E. Rosen
                                Magistrate Judge Mona K. Majzoub

**RICHARD ARTERBERRY**,

        Defendant.

_____/

**OPINION AND ORDER FINDING DEFENDANT COMPETENT TO STAND TRIAL**

This matter comes before the Court on Defendant's motion seeking that the Court order a forensic evaluation of Defendant in order to determine his competency to stand trial, pursuant to the Insanity Defense Reform Act of 1984, 18 U.S.C. § 4241 (Dkt. # 25). On October 16, 2013, Defendant Richard Arterberry, along with several co-defendants, was indicted for conspiracy to possess with intent to distribute several controlled substances, including N-Benzylpiperazine, methamphetamine, MDMA, and marijuana, in violation of 21 U.S.C. §§ 846 and 841(a)(1). First Superseding Indictment, Dkt. # 7, at 1-2. On May 3, 2014, Defendant filed an amended motion for a non-custodial forensic evaluation

1

assessing his competency to stand trial, pursuant to 18 U.S.C. § 4241. Dkt. # 25. Following a hearing on June 10, 2014, the Court ordered that Defendant be examined by Jack P. Haynes, Ph.D., a forensic psychologist. Dkt. # 29. That report reached the conclusion, based on an interview and a battery of testing, that "Mr. Arterberry may arguably be marginally able to assist in some ways in his defense by working with his lawyer, but he would do this in a limited and extremely concrete manner that may not be helpful." Report of Dr. Haynes, at 12. Accordingly, Dr. Haynes provided the opinion that Defendant is not competent to stand trial. *Id.*

After reviewing Dr. Haynes's report, the parties agreed that "there is reasonable cause to believe that the defendant may be suffering from a mental disease or defect rendering him mentally incompetent," but also agreed that "the examiner failed to review several documents provided by the parties," and accordingly, the parties requested that the Court order a custodial examination by another examiner, which the Court ordered. Stipulated Order for Custodial Psychiatric or Psychological Evaluation, Dkt. # 32. That examination was performed by Christine Scronce, Ph.D., a forensic psychologist at the Metropolitan Correctional Center in Chicago, Illinois. Dr. Scronce's opinion of Mr. Arterberry's competence differs substantially from Dr. Haynes's -- Dr. Scronce found that, based on an interview and a battery of tests, "Mr. Arterberry made efforts to falsely

2

portray cognitive deficits, memory problems, and a poor comprehension of the legal process. While Mr. Arterberry may decide to continue to be uncooperative by feigning mental problems, he appears capable of collaborating in a defense." Report of Dr. Scronce, at 9. Accordingly, Dr. Scronce provides the opinion that Mr. Arterberry does not currently suffer from mental disease or defect which renders him unable to understand the nature and consequences of the proceedings against him, or to properly assist in his defense." *Id.* The parties reconvened for a competency hearing on February 18, 2015, at which the parties agreed to rest on the two psychologists' reports for the purposes of the Court's competency evaluation. Dkt. # 34.

"A district court is obligated 'to inquire into a defendant's competency whenever there is reasonable cause to believe that the defendant is incompetent to stand trial.'" *United States v. Heard*, 762 F.3d 538, 541 (6th Cir. 2014) (quoting *United States v. Denkins*, 367 F.3d 537, 545 (6th Cir. 2004)). This obligation is rooted in a criminal defendant's due process rights, which are violated if the defendant is tried while legally incompetent. *Pate v. Robinson*, 383 U.S. 375, 378 (1966). The test for determining whether a defendant is competent to stand trial is well-established -- "To be adjudged competent, a defendant must have 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and 'a rational as well as factual understanding of the proceedings

3

against him.'" *Filiaggi v. Bagley*, 445 F.3d 851, 858 (6th Cir. 2006) (quoting *Dusky v. United States*, 362 U.S. 402, 402 (1960) (per curiam)); *see also Drope v. Missouri*, 420 U.S. 162, 171 (1975) ("It has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial."). Several factors may weigh on the inquiry including "evidence of a defendant's irrational behavior" and "medical opinion on competence to stand trial." *Drope*, 420 U.S. at 180. In this case, the determination turns on the relative thoroughness and reliability of the two examining psychologists' reports.

Dr. Haynes conducted an initial interview of Defendant to obtain background information about his familial and relationship history, educational background, employment history, and physical and mental health. Dr. Haynes describes Defendant's demeanor during the interview as "not uncooperative," but Dr. Haynes notes that Defendant "volunteered little, making few spontaneous statements, responding concretely and with minimal words to questions, sometime [sic] appearing mildly annoyed." Report of Dr. Haynes, at 3. Defendant's background, as described in Dr. Haynes's report, does not appear to be strongly out of the ordinary, though Defendant lacks substantial connections with his family and did not receive any education beyond the eighth grade. *Id.* at 3-4. Defendant

4

has not been employed for the last "eight or nine years," and he is supported by "disability (SSI) funds" and his mother. *Id.* at 4. Defendant "did not indicate any history of having been diagnosed with mental retardation and seemed to indicate that he had been in regular rather than Special Education classes." *Id.* Of particular importance, Defendant "indicated that he never has had a serious head injury," and he reported no physical injuries that would imply severely reduced cognitive functioning, though he has had occasional mental health treatment as well as issues with substance abuse. *Id.* at 4-5.

In addition to his interview of Defendant, Dr. Haynes conducted the Wechsler Adult Intelligence Scale-IV ("WAIS-IV") on Defendant. That test, often considered the "gold standard" in intelligence testing, provides an "approximation of an individual's overall cognitive functioning" and includes various subsections to test different cognitive abilities. *United States v. Montgomery*, No. 2:11-CR-20044-JPM-1, 2014 WL 1516147, at *27 (W.D. Tenn. Jan. 28, 2014). Defendant's scores on the WAIS-IV test were uniformly low: at or below the bottom 0.1 percentile in each category measured by the test.[1] Report of Dr. Haynes, at 6. Dr. Haynes describes these results as "reflect[ing] [Defendant's] functioning in the Extremely Low category of intelligence." *Id.* at 7. Critically, however, Dr.

---

[1] According to Dr. Haynes's report, Defendant had previously been administered the WAIS-R test, a prior iteration of the WAIS-IV test. Defendant's scores on that earlier test all fell within the bottom 1 percentile, "though his current results are even lower." *Id.* at 7.

Haynes notes in his report that Defendant "functioned at a very slow pace, at times seeming inattentive and perhaps somewhat resistant, this being noticed on several of the subtests. For one of the subtests, the directions were repeated." *Id.* at 6. Despite this observation, Dr. Haynes opines that Defendant's "results likely accurately reflected his intellectual abilities" and that "[t]here was no observed evidence of malingering." *Id.* at 7.

Dr. Haynes also conducted a "semi-structured interview" called the Evaluation of Competency to Stand Trial-Revised Instrument ("ECST-R"). *Id.* at 10. As described in Dr. Haynes's report:

> The ECST-R primarily contains 28 items consisting of multiple questions which produce scores on four scales which assess competency to stand trial. There are four dimensions of evaluation: Consult with Counsel (CWC), Factual Understanding of the Courtroom Proceedings (FAC), Rational Understanding of the Courtroom Proceedings (RAC), and Atypical Presentation Scale.

*Id.* The ECST-R interview raised some potential issues regarding Defendant's knowledge of the relevant legal structures, though it appears that the ECST-R is vulnerable to a defendant who provides answers that intentionally exaggerate his lack of understanding. For example, Defendant said "I don't know what is going on" with regard to the role of his attorney. *Id.* Dr. Haynes notes that "this is an unusual comment in some ways: a volunteered self-observation that he is puzzled." *Id.* Along similar lines of confusion, Defendant stated that he "was not sure who was in charge of the Court or ran it," could not provide a definition of the term

6

"guilty," did not know whether there were criminal charges against him, did not know whether he could face a prison sentence if convicted, did not know who would make the decision as to his potential guilt, and did not understand the function of the jury. *Id.* at 10-11.

As a result of his examination, Dr. Haynes, though recognizing that "this is a difficult case," provides the opinion that Defendant is not competent to stand trial, giving the following final reasoning:

> In the opinion of the examiner, [Defendant's] measured very low intellectual functioning is valid and reliable, in the lowest percentile, within the Extremely Low category of intelligence. Parenthetic to this low level of functioning, however, was that [Defendant] at times was mildly oppositional, annoyed, and mildly resistant to the evaluation process. These characteristics seemed to imply the possibility of slightly greater capacity than otherwise demonstrated or measured, though there is no evidence that his functioning is beyond the Extremely Low category of intelligence. There was no evidence of malingering low intelligence.
>
> The examiner's overall impression is that [Defendant] may arguably be marginally able to assist in some ways in his defense by working with his lawyer, but he would do this in a limited and extremely concrete manner that may not be helpful. There is significant question about his ability to understand the nature of the consequences of the proceedings against him.

*Id.* at 12.

Dr. Scronce's report provides a countering view. Dr. Scronce, like Dr. Haynes, conducted an interview of Defendant to obtain background information. Like Dr. Haynes, Dr. Scronce found Defendant "typically vague in his responses"

7

and noted that he "provided little spontaneous detail." Report of Dr. Scronce, at 2. The two reports provide nearly identical background information, with the exception of some of Defendant's reported prior drug use and history of mental health treatment, which Dr. Scronce reports as less extensive than Dr. Haynes does. *See id.* at 3-4.

The most relevant substance of Dr. Scronce's report relates to the WAIS-IV and ECST-R tests that Dr. Haynes administered, as well as follow-up tests that Dr. Scronce conducted. Dr. Scronce notes that the WAIS-IV results, as well as a prior competency exam, "raised concerns about defendant's intellectual functioning." *Id.* at 4. Dr. Scronce emphasizes, however, the potential malingering concerns that Dr. Haynes alluded to:

> Although [Dr. Haynes's report] noted that during the testing, [Defendant] seemed inattentive and "perhaps somewhat resistant," Dr. Haynes commented that the results "likely accurately reflected his intellectual abilities." However, Dr. Haynes later related having a "sense that there was some self-serving aspect" when defendant reported feeling "confused" and claimed he "sometimes does not know what is going on." It was also notable that [Defendant] gave some unusual responses to the mental status questions, such as listing Bugs Bunny when asked to name five famous living persons.
>
> . . . Dr. Haynes noted that the defendant appeared oppositional at times, responding to some queries with comments like, "You tell me." Dr. Haynes concluded that the defendant's IQ tests were "valid and reliable," although the evaluator noted the defendant's mildly oppositional and resistant attitude toward the examination could indicate his intellectual capacity was "slightly greater" than what was measured. The report noted, "There was no evidence of malingering

8

low intelligence," although no malingering measures were administered.

*Id.* at 5. Due to the potential for malingering that Dr. Haynes's report raised, Dr. Scronce performed three separate formal malingering tests. She first administered the Validity Indicator Profile ("VIP") test, which, according to her report, is "a measure designed to identify valid and invalid response styles on cognitive tests," such as the WAIS-IV test that Dr. Haynes administered to Defendant. *Id.* at 6. Dr. Scronce's report states that

> [Defendant's] response style was classified as Invalid/Suppressed on the Nonverbal subtest and Invalid/Irrelevant on the Verbal subtest. The classification of Suppressed responding indicated that he made a strong effort to answer items incorrectly on the Nonverbal subtest. The classification of Irrelevant responding on the Verbal subtest indicated he essentially responded randomly. Because his performance indicated he was not motivated to perform well on cognitive testing, he was not administered any tests of intelligence, as their results would likely have been invalid.

*Id.* at 6-7.[2]

---

[2] Dr. Scronce's report does not provide a detailed methodological explanation indicating how the VIP actually detects malingering. The academic literature, however, provides some background:

> The Validity Indicator Profile . . . is a two-alternative forced choice procedure intended to identify when the results of cognitive and neuropsychological testing may be invalid because of malingering or other problematic response styles. The test consists of 100 problems that assess nonverbal abstraction capacity and 78 word-definition problems. The VIP attempts to establish whether an individual's performance in an assessment battery should be considered representative of his or her true overall capacities (valid or invalid).

9

In addition to the VIP, Dr. Scronce administered two other malingering tests. First, she administered the Test of Memory Malingering ("TOMM"), "a forced-choice test designed to distinguish between malingered and true memory impairment." Dr. Scronce's report states that while Defendant "was attentive during the test and gave the appearance of deliberating over his responses," he "performed very poorly on the test, obtaining scores that were no better than he should have been able to achieve by random responding," results which "clearly indicate[] sub-optimal effort" and "strongly suggest[] [Defendant] attempted to feign memory impairment." *Id.* at 7.[3]

---

Richard I. Frederick & Ross D. Crosby, *Development and Validation of the Validity Indicator Profile*, 24 Law & Hum. Behav. 59, 59 (2000). The Frederick and Crosby article goes on to explain various metrics that the test uses to identify invalid responding. Many relate to *consistency*, that is, whether an individual performs comparably on questions of comparable difficulty, or whether the pattern of correct and incorrect responses is random, which would indicate malingering. *See id.* at 63-65. On the whole, the test appears to be well-established in the field and well-studied.

[3] As with the VIP, Dr. Scronce's report does not provide detail as to how the TOMM works. However, the test is well-established and information about its processes is readily available. According to Pearson Education, Inc., the distributors of the TOMM, the test "is a 50-item visual recognition test" that "consists of two learning trials and an optional retention trial, and provides two cutoff scores": (1) performance that is below chance, and (2) performance that is below established norms of scores attained by head injured and cognitively impaired patients. Pearson Clinical, Test of Memory Malingering (TOMM), http://www.pearsonclinical.com/psychology/products/100000191/test-of-memory-malingering-tomm.html#tab-details (last visited March 1, 2015). Essentially, the test identifies the extent to which an individual is able to remember whether particular visual items had been presented to him during the learning trials. If that

Last, Dr. Scronce administered the Inventory of Legal Knowledge ("ILK"), a test containing 61 true-false items related to the legal process. *Id.* at 7. According to the distributors of that test, it "utilizes two strategies: one based on [detecting] scores that are significantly lower than scores expected by chance, and a second based on scores that are significantly lower than those attained by relevant normative groups." PAR, Inventory of Legal Knowledge, http://www4.parinc.com/products/Product.aspx?ProductID=ILK (last visited March 1, 2015). As Dr. Scronce's report details, that second level of analysis was not necessary; Defendant "obtained a total score of only 14 out of 61," a result that would be expected to occur in "fewer than 1 in 100,000" tests taken by an examinee who was merely responding randomly. *Id.* That is to say, if Defendant had *absolutely zero knowledge* about the legal system, he still would only be expected to do as poorly as he did about 0.001% of the time. Accordingly, "[t]he results indicated that the defendant discerned the correct responses but purposely provided incorrect responses." *Id.*

Dr. Scronce's final opinion was heavily influenced by the outcomes of these three malingering tests, when placed in context:

> [The interview of the defendant] yielded evidence that the defendant was exaggerating or feigning cognitive difficulties. The lack of understanding he portrayed was particularly suspicious considering

---

individual's scores are below chance or below typical scores of impaired patients, malingering may be inferred.

11

> his criminal history, including his prior conviction for federal drug charges. It was therefore suspected that [Defendant] might have been more cognizant of his legal circumstances and more knowledgeable about the criminal process than he portrayed. . . . [Defendant] obtained an ILK score far below what he should have been able to achieve simply by guessing. His below-chance score on the ILK demonstrated he intentionally provided incorrect responses to questions about . . . the legal process in an effort to portray deficiencies in his understanding of the legal process.

*Id.* at 9. Accordingly, Dr. Scronce stated that, in her professional opinion, Defendant "does not currently suffer from a mental disease or defect which renders him unable to understand the nature and consequences of the proceedings against him, or to properly assist in his defense." *Id.*

After thoroughly reviewing the reports of both doctors, the Court finds Dr. Scronce's methodology and report significantly more thorough and reliable. As is carefully recounted in Dr. Scronce's report, Dr. Haynes's examination of Defendant raised clear warning signs of malingering, which Dr. Haynes himself notes in his report, and yet Dr. Haynes never conducted any malingering tests. Instead, Dr. Haynes simply declares in his report, *ipse dixit*, that Defendant is not exaggerating his cognitive deficits. Dr. Scronce's opposing conclusion, however, is supported by three separate empirical tests of Defendant's malingering, each of which provides compelling evidence in support of the conclusion that Defendant is exaggerating his deficits. In particular, the ILK results are striking -- it stretches plausibility that Defendant would get only 14 of the 61 multiple choice questions

correct if his deficits were legitimate. Instead, mere probability gives the Court very strong confidence that Defendant was intentionally failing the test. As such, the Court cannot give any weight to Defendant's poor scores on the WAIS-IV test that Dr. Haynes administered, nor is it convinced by Defendant's interview answers that indicated his lack of understanding of the trial process. The only plausible conclusion is that Defendant was exaggerating any deficits he has on those measures as well. The Court finds that Defendant is competent to stand trial.

Accordingly,

IT IS HEREBY ORDERED that Defendant's motion seeking that the Court declare him incompetent to stand trial (Dkt. # 25) is DENIED.

**IT IS SO ORDERED.**


Dated: March 5, 2015    s/Gerald E. Rosen
                        Chief, Judge, United States District Court


I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on March 5, 2015, by electronic and/or ordinary mail.

                        s/Julie Owens
                        Case Manager, (313) 234-5135